**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

In re:

      **TERRORIST ATTACKS ON**
      **SEPTEMBER 11, 2001**


-----------------------------------------------------------------X

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:    <u>Hoglan v. Islamic Republic of Iran</u>, 11-CV-7550 (GBD)(SN)

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____           │
│ DATE FILED: __ 10/14/2016 __     │
└─────────────────────────────────┘
```

**03-MDL-1570 (GBD)(SN)**

**<u>REPORT AND</u>**
**<u>RECOMMENDATION</u>**

      On October 12, 2016, this Court issued a Report and Recommendation to the Honorable George B. Daniels recommending the entry of default judgments awarding compensatory damages to 13 of the 15 Estates represented in the case and 190 of the 278 individual family member plaintiffs in the amount of $1,759,715,035. This Report and Recommendation concerns the solatium claims of 79 additional individual plaintiffs in the <u>Hoglan</u> litigation. Though these plaintiffs are not "immediate family members" of decedents who perished in the 9/11 attacks as that term is currently defined, they urge that given the close nature of their emotional connection to their lost loved ones, their strong family bonds, and the grief and anguish which they have faced as a result of the terrorist attacks of September 11, 2001, they should be eligible for solatium damages as "functional equivalents" of immediate family members of 9/11 decedents.

      The Court has carefully considered each claim presented by individual plaintiffs in this case. Plaintiffs have presented deeply personal affidavits, which present touching images of the love and compassion that existed between them and the 9/11 decedents, and compellingly relate the degree to which the heinous acts of September 11 tore their families' lives asunder.

Nevertheless, the necessary boundaries of tort law, applicable even in cases concerning terrorist attacks as massive and destructive as the ones the Defendants supported, constrain this Court's discretion to award solatium damages to many of the plaintiffs represented in this litigation. I am conscious of the fact that in the complex web of human relationships, non-immediate family members may have suffered as much, if not more, than immediate blood relatives. Though not all of them are eligible for monetary compensation for their damages, in a world where the scourge of terrorism is still among us, their stories should serve as both examples of fortitude in the face of great adversity and stark reminders of the human cost of such senseless brutality.

## I.      Legal Standard for Solatium Claims Under the FSIA

Solatium claims in FSIA terrorism cases are "indistinguishable" from common-law claims for intentional infliction of emotional distress. Estate of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 27 n.4 (D.D.C. 2009) (quoting Surette v. Islamic Republic of Iran, 231 F. Supp. 2d 260, 267 (D.D.C. 2002)). Although such cases arise under a federal cause of action, 28 U.S.C. § 1605A(c), the common law of intentional infliction of emotional distress governs questions of who is entitled to recover damages. As such, courts have looked at "state decisional law, legal treatises, or the Restatements in order to find and apply what are generally considered to be the well-established standards of state common law . . . ." Estate of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 24 (D.D.C. 2009). This is necessarily so because of the "interest in promoting uniformity of determinations with respect to [state sponsored terrorist acts]" and the fact that "generally accepted legal standards of the states provide the only steady foundation for the rules of decision." Id. at 24–25 (citations and quotation marks omitted). A nearly universal source that most courts have considered to be a "proxy for state common law" is

Restatement (Second) of Torts § 46. Bettis v. Islamic Republic of Iran, 315 F.3d 325, 333 (D.C. Cir. 2003).

This section states:

Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
    (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
    b) to any other person who is present at the time, if such distress results in bodily harm.

Restatement (Second) of Torts § 46 (1965).

According to the Restatement, therefore, third parties towards whom extreme and outrageous conduct has not been directed, and who themselves did not suffer bodily harm, may recover under two conditions: (1) they were physically present at the time of the conduct; and (2) they are an immediate family member of the person at whom the conduct was directed. Id.

The above notwithstanding, the "physical presence" requirement has been almost universally waived for solatium claims arising in under the FSIA's terrorism provisions. This is so because "[c]ourts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families." Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005); Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27, 35 (D.D.C. 2001) ("'If the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability.'" (citing Dan B. Dobbs, The Law of Torts § 307, at 834 (2000))). The Court agrees with this analysis, and has previously recommended the award of solatium damages to

immediate family members who were not physically present at the site of the terrorist attacks that took their loved ones' lives. See In re Terrorist Attacks on Sept. 11, 2001, No. 03-MDL-1570 (GBD)(FM) (S.D.N.Y. Oct. 12, 2016) (ECF No. 3358) ("Hoglan Report"); In re Terrorist Attacks on Sept. 11, 2001, No. 03-MDL-1570 (GBD)(FM), 2015 WL 9468813 (S.D.N.Y. Dec. 28, 2015) ("Ashton Report"); In re Terrorist Attacks on Sept. 11, 2001, No. 03-MDL-1570 (GBD)(FM), 2012 WL 4711407 (S.D.N.Y. Oct. 3, 2012) ("Havlish Report").

Courts, however, have been more reticent in loosening the "immediate family" requirement in considering solatium claims in terrorism cases beyond the traditional definition of the term to include only parents, children, siblings, and spouses.  See, e.g., Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27, 36 (D.D.C. 2001) ("This Court defines one's immediate family as his spouse, parents, siblings, and children . . . consistent with the traditional understanding of one's immediate family."). The following section will summarize the standard to be applied for solatium damages for non-immediate family members of terrorism victims.

## II.     Non-Immediate Family Members' Solatium Claims under the FSIA

### A.  Legal Standard

The Court of Appeals for the D.C. Circuit addressed the question of non-immediate family members in Bettis v. Islamic Republic of Iran, 315 F.3d 325 (D.C. Cir. 2003), where it rejected solatium claims brought by nieces and nephews of a terrorism victim. Referring to the Restatement (Second) of Torts, the court noted that "§ 46(2)(a) is perfectly plain in its reference to 'immediate family.' It does not refer to 'family members,' 'near relatives,' 'close associates,' or persons with whom the victim has 'close emotional ties' – rather, it says, plainly, 'immediate family.' And there is no doubt whatsoever that, in this case, nieces and nephews are not 'immediate family' members." Id. at 335–336. The court expressed concerns over choosing to

include nieces and nephews within the definition of "immediate family" instead of, for example, "close friends who may be even more egregiously affected by state-sponsored terrorism" and emphasized the clarity of the prevailing common law as reflected in § 46(2)(a). Id. at 337–38. Accordingly, it held that "[a]s the law now stands, the nieces and nephews of a victim have no viable basis for a third-party claim of intentional infliction of emotional distress under the statute." Id. at 338.

But the Bettis court did hint that rare exceptions to the "immediate family" requirement existed. "In a few limited circumstances, some courts have allowed relatives who either *resided in the same household* with the victim or were *legal guardians* to recover for negligent infliction of emotional distress . . . .   In these cases, the parties in issue were members of the victim's household, and they were viewed as the functional equivalents of immediate family members." Id. at 337 (emphasis in original).

To illustrate what it meant by "functional equivalent," the Bettis court cited a case from this District. Sullivan v. Ford Motor Co., No. 97-CV-0593 (RCC), 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000). In Sullivan, the court awarded solatium damages to an aunt who was the legal custodian of her nephew, "performed all of the duties and responsibilities of a natural or adoptive parent," and was "the only family with whom [the nephew] shared his life on a daily basis from the time he was an infant of 12 months until his death." Id. at *11 & n.3. This functional and legal responsibility allowed for such an award notwithstanding New York State's stringent definition of "immediate family member" for the purpose of negligent infliction of emotional distress claims. See Trombetta v. Conkling, 82 N.Y.2d 549, 533 (1993) (refusing "on firm public policy grounds" to extend the cause of action for emotional injuries "to all bystanders who may

be able to demonstrate a blood relationship coupled with significant emotional attachment or the equivalent of an intimate, immediate familial bond").

Further FSIA terrorism cases have elucidated and refined the "functional equivalent" language from Bettis. In Estate of Heiser v. Islamic Republic of Iran, the court emphasized the importance of cohabitation, noting that "in those rare cases in which the parties at issue had lived in the victim's immediate household and had been in other important respects like a spouse, parent, sibling, or child to the victim, circumstances may require a slight stretching of the immediate-family requirement . . . ." 659 F. Supp. 2d 20, 29 (D.D.C. 2009). On this logic, the Heiser court awarded solatium damages to two non-adoptive stepfathers who were found to be the "functional equivalents of fathers" because they lived in the same household while their stepsons were minors and treated them as their own sons in every sense (financially, emotionally and socially). Id.

In Valore v. Islamic Republic of Iran, the court followed the rationale it had adopted in Heiser, awarding solatium damages to a non-adoptive stepfather and stepbrother, but denying them to an uncle and niece. 700 F. Supp. 2d 52, 79 (D.D.C. 2010). While the decision is sparse on details about the family relationships, the court remarked that the stepfather and stepbrother treated the victims as a son and a brother, respectively, and would engage in activities such as hunting and fishing together. Id. at 79–80. Nevertheless, the Valore court, as well as the Bettis decision that it relied on, made clear that "[t]he mere existence of a 'close relationship' between a claimant who is a non-immediate family member and the victim . . . falls 'far short of what § 46(2)(a) requires.'" Id. at 79 (citing Bettis, 315 F.3d at 337).

In this District, two cases have awarded solatium damages to non-immediate family members. In Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217, 236 (S.D.N.Y.

2003), the court awarded solatium damages to a grandmother who acted as a quasi "surrogate mother" to the decedent.[1] The court noted that she had played a maternal role in the decedent's life since 1973, but offered little additional support for the award. In <u>Knox v. Palestinian Authority</u>, 442 F. Supp. 2d 62 (S.D.N.Y. 2006), the court awarded damages to non-adoptive stepchildren of a victim of a terrorist attack; however, this case was brought under a different statute, the Antiterrorism Act of 1991, 18 U.S.C. §§ 2331-2339, and turned on the interpretation of the term "survivor" in one of its provisions. <u>Id.</u> at 75-76. The <u>Knox</u> decision relied on another case that determined that, under certain circumstances, stepchildren were entitled to damages as "dependents" under the Death on the High Seas Act. <u>Stissi v. Interstate & Ocean Transp. Co. of Philadelphia</u>, 590 F. Supp. 1043, 1036 (E.D.N.Y.), <u>vacated in part on other grounds</u>, 765 F.2d 370 (2d Cir. 1985) (citing "factors such as the relationship of parent to child, continuous living together, harmonious family relationships, participation of the deceased in family services and his disposition and habit to tender aid, solace and comfort when required" in making determination).

Plaintiffs urge the Court to expand the scope of solatium recovery in this case by adopting definitions relating to the intentional infliction of emotional distress that were allegedly expanded by the Restatement (Third) of Torts § 46 ("An actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional harm to another is subject to liability for that emotional harm . . . .). Plaintiffs also note that the Restatement (Third) section on negligent infliction of emotional distress uses the broader term "close family member," and calls for a "functional approach" in determining who qualifies for recovery. <u>Id.</u> at § 48 ("An actor who negligently causes sudden serious bodily injury to a third person is subject to liability for serious

---

[1] The estate of the grandmother in question, since deceased, is one of the Individual Plaintiffs in this case.

emotional harm caused thereby to a person who: (a) perceives the event contemporaneously, and (b) is a close family member of the person suffering the bodily injury."); id. at § 48 cmt. h ("Sometimes people live functionally in a nuclear family without formal legal family ties. When defining what constitutes a close family relationship, courts should take into account changing practices and social norms and employ a functional approach to determine what constitutes a family."). Therefore, Plaintiffs argue, anyone who can show that the nature of his or her family relationship to the decedent—functionally like that of a spouse, parent, sibling, or child—has caused him or her to feel the specific type of emotional distress cause by a crime perpetrated on their loved one, should be able to bring a claim for solatium.

Plaintiffs' reliance on the Restatement (Third) of Torts, however, is not appropriate. First, it does not appear that the Restatement (Third) of Torts actually supports the Plaintiffs' position. While the Restatement (Third)'s authors may have sought to loosen the "immediate family" requirement, they identified "bystander" status as key to setting intelligible limits on liability. Though such language does not appear in the text of § 46, Comment M to that section clearly states that the section "limits recovery for emotional harm to 'bystanders' who are close family members and who contemporaneously perceive the event." Id. at § 46 cmt. m (emphasis added). Indeed, the Reporter's Notes on Comment M explicitly reference the FSIA terrorism-related decisions which have relaxed the presence requirement—and do so disapprovingly. Id. at § 46 cmt. m reporter's notes (stating that relaxing the presence requirement was a "questionable determination," noting that "no appellate review of these cases has taken place" because of Iran's default, and concluding that the courts' reasoning in the FSIA terrorism cases "falls well short of the development of another exception to the presence requirement that the Institute would endorse."). If it were to apply this definition, the Court could not simply adopt the Restatement

(Third)'s looser "close family members" formulation while ignoring that its drafters had explicitly relied on "bystander" status as a bulwark against unbounded liability. Id. at § 46 cmt. m ("Modern courts have continued to limit liability to cases in which the person seeking recovery contemporaneously perceived the event . . . . This limitation may be justified by the practical necessity of drawing a line, since the number of persons who suffer emotional harm at the news of a homicide or other outrageous attack may be virtually unlimited."). Therefore, a strict application of the Restatement (Third)'s approach would quite possibly lead to the conclusion that none of the Plaintiffs—including the immediate family member Individual Plaintiffs who were the subject of my prior Report and Recommendation—may recover because they did not "contemporaneously perceive" the terrorist attacks.

Second, it is clear that the Restatement (Second)'s approach is regularly adopted in this Circuit and is the law in New York as well as the vast majority of other jurisdictions across the country. See Goodrich v. Long Island Rail Rd. Co., 654 F.3d 190, 196 (2d Cir. 2011) (noting that the Restatement (Second)'s approach to IIED torts "has been followed by most, if not all, American jurisdictions"); Howell v. New York Post Co., 81 N.Y.2d 115, 121 (1993) (commenting that New York has adopted the Restatement (Second) formulation). Plaintiffs have not cited a single case of either a state or federal court using the Restatement (Third) formulation in *any* case involving the intentional infliction of emotional distress, much less any FSIA terrorism case. Whether or not the Restatement (Third) is persuasive, it does not represent the state of the common law today. Therefore, as "generally accepted legal standards of the states provide the only steady foundation for the rules of decision," Heiser, 659 F. Supp. 2d at 24, the Court will, as all of the courts examining FSIA terrorism cases have done, adopt the Restatement

(Second) definition of the intentional infliction of emotional distress tort for the purpose of adjudicating plaintiffs' solatium claims.

### B.  Criteria Adopted by This Court

In light of the above discussion, the Court is guided by two considerations. On the one hand, courts have been reticent to stretch the "immediate family" requirement beyond its traditional definition, cognizant of tort law's need to establish intelligible boundaries for defendants' liability. Heiser, 659 F. Supp. 2d at 29 ("[T]he Court must bear in mind the realities of tort law and the necessity of limiting recovery to a definable scope of individuals.") (citations and quotation marks omitted); Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 45 (D.D.C. 2007) ("Though the Court does not deny the extreme pain and suffering felt by those outside of this class of individuals, it is necessary to draw such a line at immediate family members in order to prevent a potentially unlimited number of plaintiffs who were not present at the site of the attack from seeking redress.") (citations and quotation marks omitted)). On the other hand, courts have also recognized the uniquely heinous nature of terrorism, as well as the deliberate intent of terrorists and their sponsors to inflict suffering on both victims and their families. See, e.g., Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress.")

Accordingly, the Court has identified several factors in determining whether or not an individual qualifies as a "functional equivalent" of an immediate family member under the definition in Restatement (Second) of Torts § 46 (2)(a).

The first factor is long-term residence or co-habitation in the decedent's household. This was a key, if not decisive, factor mentioned in virtually all of the FSIA terrorism cases that have

discussed awarding solatium damages to non-family members. Bettis, 315 F.3d at 337 (referencing court decision which allowed relatives who "*resided in the same household*" with the victim to recover); Heiser, 659 F. Supp. 2d at 29 ("[T]hose rare cases in which the parties at issue had lived in the victim's immediate household . . .  may require a slight stretching of the immediate-family requirement . . . ."); Valore, 700 F. Supp. 2d at 79 (same). This requirement serves as a useful proxy to distinguish between family relationships which are emotionally strong and those which approximate that of the "immediate family." Intermittent or sporadic cohabitation (such as that characterized by brief periods of help in times of particular need instead of a long-standing, semi-permanent arrangement) would not generally be sufficient to fulfill this requirement.

The second factor is whether, in addition to cohabitation, the non-immediate family member ever played a guardian or custodian-like role in the decedent's life (or, vice versa, whether the decedent played such a role in the life of the family member). While the Bettis court referred expressly to "legal guardians," 315 F.3d at 337, in the context of stepparent/stepchild relationships, the Heiser and Valore decisions did not view legal guardianship as dispositive, instead looking at whether the stepparent emotionally, financially, and socially treated their stepchild as equivalent to a biological child. Heiser, 659 F. Supp. 2d at 29; Valore, 700 F. Supp. 2d at 79. The Court will follow the Heiser and Valore decisions in considering whether the family members claiming to be "functional equivalents of parents" or "functional equivalent of children" on the facts of each case, rather than by treating their legal status as controlling. The Court considers the length of the alleged guardian- or custodian-like relationship and for the number of years the functional equivalent to a child was a minor living in the claimant's home to be important factors.

The third factor in determining the "functional equivalence" of a non-immediate family member in the parent or child role is whether the biological family member in question was absent in the family life. For example, a stepmother would be less likely to be considered a "functional equivalent" of a (biological) parent if the decedent maintained close contact with and/or received support from his or her (biological) mother, even if they lived in the custody of their father and also received significant support from the stepmother. On the other hand, if the non-immediate family member was stepping in to play a "functionally equivalent" role because of the death or long-term absence of the biological family member, this would make a functional equivalence finding more likely.

### C.  Special Classes of Individual Plaintiffs

#### 1.  Aunts, Uncles, Nieces, Nephews, and Cousins

The Court has received numerous declarations from uncles, aunts, nieces, nephews and cousins of the 9/11 decedents, many of which compellingly attest to the closeness of the relationship that they enjoyed going back to their early childhood. While the Court is acutely sympathetic to their claims and acknowledges the anguish that they felt as close relatives of the decedents after their brutal murders, no court to date considering FSIA terrorism claims has awarded solatium damages to a family member in the above categories. Bettis, 315 F.3d at 338 ("As the law now stands, the nieces and nephews of a victim have no viable basis for a third-party claim of intentional infliction of emotional distress under the statute."); Valore, 700 F. Supp. 2d at 79 ("Nieces, nephews, aunts, and uncles . . . are not members of one's immediate family."). In light of this precedent, and the Court's responsibility to limit the scope of tort liability to a definable group of plaintiffs, a showing that an uncle, aunt, nephew, niece, or cousin was a "functional equivalent" of a member of the decedent's family would require overwhelming

evidence that the family member in question either adopted the decedent (uncle or aunt), was adopted by decedent (nephew or niece), or was adopted into the same family as decedent (cousin) in all but name. Cf. Sullivan, 2000 WL 343777 at *11 & n.3 (describing relationship where aunt was legal custodian and sole caregiver for nephew). Having carefully reviewed the evidence presented by each Individual Plaintiff, the Court concludes that none of the family members in these categories meets this exacting standard.

### 2.   Fiancées and Domestic Partners

Several of the Individual Plaintiffs are fiancées, and one is a same-sex domestic partner, of the decedents that perished in the September 11 attacks. The issue of whether an individual who intended to, but did not or could not legally marry a decedent victim of a terrorist attack can recover solatium damages has arisen only once in the FSIA terrorism case law. Surette v. Islamic Republic of Iran, 231 F. Supp. 2d 260, 270–71 (D.D.C. 2002) (awarding solatium damages to a partner who had been in a relationship with decedent for twenty years and shared a home with him). In the context of negligent infliction of emotional distress, where many states limit bystander recovery to close family members, some states have barred recovery to non-marital partners absolutely, while others have permitted claims upon sufficient proof of a long-lasting relationship equivalent to that of a spouse. Compare Grotts v. Zahner, 115 Nev. 339, 341 (1999) (holding that fiancée could not bring claim because "[a]ny non–family relationship" between the plaintiff and the injured primary victim "fails, as a matter of law" to confer NIED standing) and Elden v. Sheldon, 46 Cal. 3d 267, 277 (1988) (denying fiancé's claim and commenting that "we cannot draw a principled distinction between an unmarried cohabitant who claims to have a de facto marriage relationship . . . and de facto siblings, parents, grandparents or children") with Graves v. Estabrook, 149 N.H. 202, 209–10 (2003) (allowing claim and considering "the

duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, the extent and quality of shared experience, and . . . whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day to day relationship, and the manner in which they related to each other in attending to life's mundane requirements.") and Dunphy v. Gregor, 136 N.J. 99, 115 (1994) (allowing fiancée claim and permitting unmarried cohabitants to prove "on a case-by-case basis that they enjoy a steadfast relationship that is equivalent to a legal marriage and thus equally deserves legal protection").

In short, there is sharp disagreement among the states as to whether nonmarital domestic partners can recover as "immediate family members." But given Congress's clear intent to allow victims' loved ones to recover damages from state sponsors of terrorism and the odious nature of the acts involved, courts considering terrorism claims under the FSIA's federal private cause of action have generally adopted generous interpretations of tort law. See, e.g., Heiser, 659 F. Supp. 2d at 29 (allowing for a "stretching of the immediate-family requirement—comparable to the way in which the unconventional nature of terrorist activity sometimes demands a suspension of the presence requirement" for solatium claims).

This Court agrees that the terrorism context is unique and therefore the absence of a link by blood or marriage does not categorically bar non-marital partners from being considered the functional equivalent of spouses who are eligible for a solatium recovery as "immediate family members." But not every intimate relationship, no matter how loving and supportive, qualifies under this demanding standard. In determining which partners qualify as being functionally equivalent to a spouse, the Court has considered the duration of the relationship, the degree of

mutual financial dependence and investments in a common life together, the duration of cohabitation and the presence or absence of a formal engagement as important factors.

### 3.   Stepparents, Stepchildren, and Stepsiblings

Stepparents, stepsiblings, and stepchildren present the Court with a unique challenge. Unlike biological family members, the relationship between the decedent and their step-relatives is typically not established at either the decedent's or their relative's birth, but at some later point. Nearly all would agree, for example, that a stepparent who enters a child's life when they are an infant and provides love and support for them for their entire life in the biological parent's absence is the "functional equivalent" of a parent. Likewise, few would dispute that a stepparent who enters a decedent's family when they have fully matured and left the family home would not qualify. Between these two extremes, substantial gray areas emerge.

As such, the Court adopts the following framework. Stepparents and stepsiblings who became part of the family when the decedent was in early childhood (roughly birth through age eight) may be deemed fully functional equivalent to biological parents or siblings and shall be entitled to full solatium damages and stepchildren who were in the same range when the decedent became part of their family shall be deemed fully equivalent to biological children. Stepparents and stepsiblings who became part of the family when the decedent had passed early childhood but was still living in the family home and undergoing secondary education (roughly ages 9 through 17) may be entitled to solatium damages reduced by one-half, and stepchildren who were in this age range when the decedent who became part of the family shall receive half damages as well. Stepparents and stepsiblings who became part of the decedent's family when the decedent had nearly finished his secondary education (roughly age 18 and above) and/or did not cohabit with the decedent for a significant period of time will likely not be deemed functional

equivalents of immediate family members and shall not be illegible for solatium awards, with the same being true for stepchildren who were this age when the decedent became part of their family. In all cases, the Court will recommend solatium awards only for those step-relatives that cohabited with the decedent and establish that they otherwise had a close and longstanding relationship.

### D.  Damages to be Awarded

In the Hoglan Report, (ECF No. 3358), I adopted a damages framework first articulated in Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229 (D.D.C. 2006), and modified by Judge Maas's Report and Recommendation in Havlish. Havlish Report, 2012 WL 3090979, at *5.  In Heiser, which awarded solatium damages to family members of servicemen killed in a 1996 Hezbollah bombing in Saudi Arabia, the court surveyed the damage awards issued in comparable cases, awarding $8 million to spouses, $5 million to parents or children, and $2.5 million to siblings. Id. at 269. In Havlish, "[c]onsidering the extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families," Judge Maas granted upward departures from the Heiser framework, raising the amount of solatium damages to $12.5 million to spouses, $8.5 million to parents or children, and $4.25 million to siblings. Havlish Report, 2012 WL 3090979, at *5. The same framework adopted in Hoglan and Havlish shall be utilized here, as follows:

| Functional Equivalent of Relationship to Decedent | Solatium Award |
| --- | --- |
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

I.      **Plaintiffs to be Awarded Solatium Damages**

A.  **Lea Michaela Bitterman**

Lea Bitterman is the stepdaughter of Donald Havlish, a 9/11 decedent whose estate and other immediate family members were awarded damages in the related <u>Havlish</u> case. Ms. Bitterman lived together in the same home with Donald Havlish, her mother, and her brother Sean Bitterman from the time she was six years old, until her stepfather was killed in the September 11, 2001 attacks when she was 18 years old. ECF No. 3194-4, Bitterman Decl. at ¶ 4. She states that she was closer to Donald Havlish than she was to her biological father; while she only saw her father "every other weekend," she was with her stepfather "every day from the time I was five." <u>Id.</u> Her relationship with Donald Havlish was virtually indistinguishable from that of a biological father and daughter; Mr. Havlish provided his stepdaughter with material support, including pets, art supplies, and her first car, accompanied her on yearly family vacations, and offered abundant moral support, including extensive "family talks" when she was a teenager. <u>Id.</u> Ms. Bitterman notes that at one point she even wanted to change her last name to Havlish, and avers that her stepfather "always tried his hardest to be a good father." <u>Id.</u> at ¶ 4–5.

On this record, the Court has no difficulty in concluding that Lea Bitterman was the functional equivalent of a daughter to Donald Havlish. She lived with Mr. Havlish through virtually her entire childhood until his tragic death. He provided all the financial, emotional, and moral support that any loving father would provide his child, and assumed all of the responsibilities inherent in the relationship, despite the lack of formal family ties by blood or adoption.

Lea Bitterman was profoundly affected by her stepfather's death. The pressures and publicity associated with the September 11 attacks caused her to withdraw from school, and

finish her last year of high school in homeschooling. Id. at ¶ 8. She broke off emotional relationships and developed issues with substance abuse, which lasted five to six years. Id. at ¶ 12–13. She has been in therapy for her grief since the September 11 attacks and has suffered from anxiety and insomnia. Id. at ¶ 16. There is no question that the death of Donald Havlish left a lasting impact on her life.

Accordingly, I recommend that Lea Michaela Bitterman be awarded the full solatium damages of $8,500,000 for a child according to the framework adopted in my previous Report and Recommendation.

**B.  Sean Bitterman**

Sean Bitterman is the stepson of Donald Havlish, and the brother of Lea Michaela Bitterman. Mr. Bitterman met his stepfather when he was five or six years old, and lived with him continuously from the time that he was eight years old until age 20, when his stepfather was killed. ECF No. 3194-4, Sean Bitterman Decl. ¶ 9. Mr. Havlish told Mr. Bitterman that he did not want to replace his biological father, but nonetheless clearly served a father role in his family. Id. Mr. Havlish taught Mr. Bitterman how to drive, fostered his interest in cars and gave him an automobile to drive when he was of age. Id. at ¶ 10. He taught Mr. Bitterman basic financial literacy and how to read the stock pages. Id. at ¶ 11. They went on frequent family vacations together. Id. at ¶ 12. Mr. Bitterman states that "Don was a huge piece of my life and he always made it a point to make sure that knew we were a piece of his life too." Id. at 13.

As was the case for his sister Lea Bitterman, the Court concludes that Sean Bitterman was the functional equivalent of a son to Donald Havlish. He lived with Mr. Havlish through virtually his entire childhood until his tragic death. Mr. Havlish provided all the financial, emotional, and moral support that any loving father would provide his child, and assumed all of

the responsibilities inherent in the relationship, despite the lack of formal family ties by blood or adoption.

Mr. Bitterman was also deeply affected by Mr. Havlish's death. He recounts that he responded primarily with anger, and turned to drinking to cope with this rage. Id. at ¶ 14. Because his drinking led to legal problems, he was not able to get a job in the automotive field that he was passionate about, despite the fact that he graduated from automotive school. Id. at ¶ 15. He had to undergo extensive therapy to accept his loss. Id. at ¶ 16.

Accordingly, I recommend that Sean Bitterman be awarded the full solatium damages of $8,500,000 for a child according to the framework adopted in my previous Report and Recommendation.

### C.  Estate of Marion Thomas

Marion Thomas (now deceased) was the paternal grandmother of 9/11 decedent George Smith. After Mr. Smith's father left his home in Pennsylvania to start a new family in New York, Mr. Smith's mother was killed in 1972 and his maternal grandmother passed away shortly thereafter. Marion Thomas then took Mr. Smith and two other siblings into her home and raised them as her own. ECF No. 3194-4, Decl. Christine Jackson ¶ 5. Given the complete absence of any other adult figures, "Marion Thomas became the matriarch of the family" for Mr. Smith and his siblings, and her home "was really the family home." ECF No. 3194-4, Decl. Elaina Smith ¶ 6. Mr. Smith lived with Marion Thomas until he graduated from high school. ECF No. 3194-4, Decl. Carl Smith ¶ 6. Thereafter, they stayed in constant contact throughout his adult life, at yearly family reunions which Mr. Smith never failed to attend. ECF No. 3194-4, Decl. Christine Jackson ¶ 8.

Marion Thomas was already found to be the functional equivalent of a parent in a FSIA terrorism case stemming from the September 11 attacks against the Republic of Iraq. Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217, 236 (S.D.N.Y. 2003). In that case, the court found that Marion Thomas had served as Mr. Smith's "surrogate mother" since 1973, and that they maintained a close relationship to this day. Marion Thomas testified that "[Mr. Smith] and I were very close when he was a boy and that closeness did not diminish when he got older. He made a point to keep in touch with me no matter where he was or what he was doing. If he was out of town, he would call me on the phone. If he went on vacation, he would send me letters or postcards. If he was in the area, he would always stop in to see me." Id.

Ms. Thomas also clearly suffered greatly as a result of her grandson's death, and her family members testify to the stark physical impact that it made on her. "When George was killed, you could see the life come right out of our grandmother. It took her a while to even get her skin color back . . . ." ECF No. 3194-4, Decl. Raymond Smith, Jr., ¶ 10; "My grandmother was sick, and she was very close to George. I think she gave up hope for herself." ECF No. 3194-4, Decl. Barbara Hargrove ¶ 6; "[My grandmother] was very devastated by [Mr. Smith's] death and I think she did not really want to go on after that. After George had passed, Granny died inside . . . . ." ECF No. 3194-4, Decl. Korry Smith, ¶ 7.

Accordingly, I recommend that the Estate of Marion Thomas be awarded the full solatium damages of $8,500,000 for a parent according to the framework adopted in my previous Report and Recommendation.

**D. Keith A. Bradkowski**

Keith A. Bradkowski was the registered domestic partner of 9/11 decedent Jeffrey Collman. Mr. Bradkowski and Mr. Collman had been together for over 11 years when Mr.

Collman was killed. ECF No. 3194-4, Keith Bradkowski Decl. ¶ 4. They had lived together since 1990 in numerous parts of the country, and immediately registered as domestic partners when the Registered Domestic Partners bill passed in California in 2000. Id. ¶ 5. Mr. Bradkowski was the beneficiary of Mr. Collman's life insurance policy, and the personal representative of Mr. Collman's estate. Id. ¶ 10. He gained the trust of Mr. Collman's family to the degree that Mr. Collman's mother, Beverly Sutton, later appointed him the executor of her estate. Id.

Mr. Bradkowski suffered grievously after his partner's death. He became clinically depressed, attended weekly grief counseling and was on antidepressant medications for two years. Id. ¶ 12. He was diagnosed with post-traumatic stress disorder and experienced recurrent nightmares that made it difficult for him to sleep. Id. ¶ 13.

After Mr. Collman's death, Mr. Bradkowski became an advocate for California Assembly Bill 2216, which provided legal inheritance rights to registered domestic partners, and was presented with the original bill and pen by California Governor Gray Davis. Id. ¶ 13.

Given the nature of their longstanding relationship, Mr. Bradkowski was clearly the functional equivalent of a spouse to Mr. Collman. Given the U.S. Supreme Court's recent decision in Obergefell v. Hodges, 135 S. Ct. 2584 (2015), which recognized the fundamental right of same-sex couples to marry, the nature of their relationship and their immediate actions to give legal effect to their partnership via California's then-existing legislation make it overwhelmingly likely that Mr. Bradkowski and Mr. Collman would have been married had the state of the law been different at the time. I find his relationship to be indistinguishable from the long-term, non-marital relationship presented in Surette, 231 F. Supp. 2d at 270–71 (awarding solatium damages to longstanding partner of terrorism victim), and therefore recommend a full award of solatium damages of $12,500,000 for a spouse.

### E.  Kathryn Collman

Kathryn Collman is the stepmother of 9/11 decedent Jeffrey Collman who married Mr. Collman's father and moved into the family home when Mr. Collman was approximately 11 years old. ECF No. 3194-4, Kathryn Collman Decl. ¶ 4. She provided significant support and guidance for Mr. Collman in his teenage years, and engaged in typical family activities such as baking and TV-watching with her stepson. Id.

Additionally, the record indicates that Mr. Collman had a limited relationship with his biological mother Beverly Sutton. ECF No. 3194-4, Decl. of Keith Bradkowski on Behalf of Beverly Sutton, Deceased ¶ 5. Mr. Collman's mother left the state when he was only 8 years old; after spending several years with foster families, he was only reunited with his father and siblings when Mr. Collman's father married Kathryn Collman. Id.

Given the absence of Mr. Collman's mother Beverly Sutton and the important role that Kathryn Collman played during Mr. Collman's formative years, I find that she was the functional equivalent of Mr. Collman's mother from the time that he was 11 years old until his death. Because she did not have a relationship with him during his childhood, I recommend that she be awarded one-half of the solatium award recommended for parents of decedents, $4,250,000.

### F.  Charles Gengler

Charles Gengler is the stepbrother of 9/11 decedent Jeffrey Collman. Their parents were married when Mr. Gengler and Mr. Collman were approximately 11 years old, and they lived together from that time until Mr. Collman graduated from high school. ECF No. 3194-4, Charles Gengler Decl ¶ 5. They did everything together as a family—including eating together, playing together, and watching television—until Mr. Collman moved out and began his adult life. Id. Mr.

Gengler notes that he "always cherished the memory of our childhood together . . . and kept in touch through our parents and an occasional phone conversation." Id.

Mr. Gengler spent a good part of his teenage years living with Mr. Collman in the same home as brothers. At the same time, they did not spend their early childhood together and appeared to be in touch only occasionally in their adult lives. Therefore, I find that Charles Gengler was the functional equivalent of a brother to Mr. Collman, but recommend that the solatium award be reduced by one-half to $2,125,000.

### G.  Susan Bohan

Susan Bohan is 9/11 decedent Jeffrey Collman's stepsister. Ms. Bohan recounts that she was only three months younger than Mr. Collman, and that they were a "big blended family." ECF No. 3194-4, Susan Bohan Decl. ¶ 7.  She attended the same school through junior high and high school and lived with Mr. Collman for six years. Id. They watched television together, cooked for the family, had friends in common, and went on family trips together. Id.

As is the case for her brother Charles Gengler, I find that Susan Bohan shared a significant part of her teenage years living in the same home with Mr. Collman, and had a relationship that was functionally equivalent to that of a sibling. At the same time, I also find that they did not spend their early childhood together and appeared to be in touch only occasionally in their adult lives. Therefore, I find that Susan Bohan was the functional equivalent of a sister to Mr. Collman, but recommend that the solatium award be reduced by one-half to $2,125,000.

### H.  Steven Gengler

Steven Gengler is 9/11 decedent Jeffrey Collman's stepbrother. Mr. Gengler was approximately four years older than Mr. Collman, but they lived together in the same home for the same amount of time as did his other stepsiblings Charles Gengler and Susan Bohan. ECF

No. 3194-4, Steven Gengler Decl. ¶ 4. While his declaration is sparser than that of his siblings, I find that his situation is otherwise indistinguishable from theirs. As such, I recommend that Steven Gengler be awarded one-half of the solatium award that I adopted for siblings of decedents in my previous Report and Recommendation, $2,125,000.

### I.   Arline Peabody-Bane

Arline Peabody-Bane is the stepmother of 9/11 decedent Michael Bane, who married Mr. Bane's father in 1984, when Mr. Bane was 15 years old. ECF No. 3194-4, Arline Peabody Decl. ¶ 4. Though they only lived together for a relatively short period of time in his teenage years, Mrs. Peabody-Bane was functionally the only mother figure in Mr. Bane's life, as his biological mother had died in childbirth. Id. ¶ 3–6. Mr. Bane called her "mother," and she considered herself to be his mother for the last 18 years. Id. ¶ 6.

I find that Arline Peabody-Bane was the functional equivalent of Mr. Bane's mother from the time that he was 15 years old until his death. Because she cohabited with Mr. Bane for only a short period of time and did not have a relationship with him during his childhood and early teenage years, I recommend that she be awarded one-half of the solatium award recommended for parents of decedents in my prior Report and Recommendation, or $ 4,250,000.

### J.   Brian Major

Brian Major is the stepbrother of 9/11 decedent Michael Bane, and shared a room and became good friends with Mr. Bane after his mother Arline Peabody married Mr. Bane's father. ECF No. 3194-4, Brian Major Decl. ¶ 5. Mr. Major has a cognitive disability, and his mother states that, had he survived, Mr. Bane would have helped them manage their finances to take care of Brian. ECF No. 3194-4, Arline Peabody-Bane Decl. ¶ 4. After Mr. Bane's death, Mr. Major states that he could no longer watch the news or pick up a newspaper due to all of the

negative associations he had with the September 11 attacks. ECF No. 3194-4, Brian Major Decl. ¶ 7.

On these facts, I find that Brian Major was the functional equivalent of a brother to Michael Bane after he joined the Bane household when Mr. Bane was approximately 15 years old. As they did not spend their childhood together, I recommend that his award be reduced to one-half of the solatium award that I adopted for siblings of decedents, $2,125,000.

### K.  Brenda E. Jobe

Brenda E. Jobe is the stepsister of 9/11 decedent Michael Bane, and Brian Major's sister and Arlene Peabody-Bane's daughter. Ms. Jobe lived with Mr. Bane for several years after her mother Arline Peabody married Mr. Bane's father, when they were both in the ninth grade. ECF No. 3194-4, Brenda Jobe Decl. ¶ 4. They were very close to one another, and purchased a car together when they were 16 years old. Id. Though they did not live in the same house after Mr. Bane began attending college, they remained close and would see each other at least several times a year. Id. After Mr. Bane's death, Ms. Jobe attended numerous counseling sessions at Ground Zero for relatives of 9/11 victims, and ultimately decided to move to a rural area out of state to be further away from the site of her trauma. Id. ¶7.

Accordingly, I find that Brenda E. Jobe was the functional equivalent of a sister to Michael Bane after she joined the Bane household when Mr. Bane was approximately 15 years old. As they did not spend their childhood together, I recommend that her award be reduced to one-half of the solatium award that I adopted for siblings of decedents in my previous Report and Recommendation, $2,125,000.

### L.  Colleen McDonald

Colleen McDonald was the fiancée of 9/11 decedent Jason Coffey. They were engaged to be married and their wedding was planned for December 7, 2002. ECF No. 3194-4, Colleen McDonald Decl. ¶ 5. They had prepared a home to begin their married lives together, having cleared out Mr. Coffey's grandparents' home and helped them move to another location. Id. They were in a long-standing relationship, and had known each other since they were thirteen years old, though they only started dating after college. Id. ¶ 5, 13. They spent all of their weekends together and travelled extensively. Id. ¶ 13–15.

After Mr. Coffey's death, Ms. McDonald was profoundly distraught. She suffered from severe stress and anxiety and had to take anxiety medication. Id. ¶ 20. She constantly spent time with her mother-in-law Frances Coffey and stayed at the Coffeys' house every day for many months. Id. ¶ 9, 20. She attended widows' support groups with Frances Coffey. Id. ¶ 21. Ultimately, she began to suffer from multiple sclerosis, and states that doctors have attributed the neurological disease to the massive amount of stress that she suffered after September 11. Id. ¶ 20. She has not remarried and does not date. Id. ¶ 22. She states that with the death of Mr. Coffey, "the young, happy Colleen died that day." Id. ¶ 23.

Despite the suffering that Ms. McDonald has undergone, she has kept the memory of Mr. Coffey alive. Seven years after Mr. Coffey's death, she adopted a girl from Vietnam, and travelled with Frances Coffey to Vietnam to pick her up. Id. ¶ 11. She named her Rosemary Angelina Coffey McDonald—with Rosemary being her grandmother's name, and Angelina being Mr. Coffey's grandmother's name. Id. Furthermore, Frances Coffey, who would have been Ms. McDonald's mother-in-law had Mr. Coffey survived, moved to Texas to be closer to her. Id.

¶ 19. Ms. McDonald states that Frances Coffey is "her second mother," and strives to support her the best she can. Id. ¶ 23.

Considering Ms. McDonald's extraordinary efforts to remain present within the lives of Mr. Coffey's family, I have no doubt that she "enjoy[ed] a steadfast relationship that is equivalent to a legal marriage and thus equally deserves legal protection." Dunphy, 136 N.J. at 115. Though she was not able to legally marry Mr. Coffey because of his untimely death, she was clearly the functional equivalent of his spouse. Accordingly, I recommend that she be awarded the full solatium damages of $12,500,000 for a spouse according to the framework adopted in my previous Report and Recommendation.

### M. Aleese M. Hartmann

Aleese M. Hartmann was the fiancée of 9/11 decedent William Godshalk. They had been in a serious relationship for several years and became engaged in August 2001. ECF No. 3194-4, Aleese M. Hartmann Decl. ¶ 20. Ms. Hartmann and Mr. Godshalk went on numerous vacations with one another, and moved in together on the day before the September 11 attacks. Id. ¶ 21.

Ms. Hartmann suffered deeply from Mr. Godshalk's death. She delivered a eulogy at Mr. Godshalk's memorial service several weeks after his death. Id. ¶ 16. By January 2002, her weight had dropped from 140 to 97 pounds, and she was briefly hospitalized. Id. ¶ 12. She was placed on a number of antidepressant medications immediately after the events, which she stayed on for approximately ten years. Id. ¶ 14.

Much like Ms. McDonald, I find that the relationship between Ms. Hartmann and Mr. Godshalk is deserving of legal protection. Therefore, I recommend that she be awarded the solatium damages for a spouse according to the framework adopted in my previous Report and Recommendation, $12,500,000.

### III.    Punitive Damages

For the reasons stated in the Hoglan Report issued on October 12, 2016, the Court recommends that Plaintiffs' claim for punitive damages be DENIED without prejudice. Plaintiffs may file supplemental briefing to justify any punitive damages that they believe the law supports. In such submission, they should address: (1) whether the case law requires a rational relationship between the level of terrorism financing by the Sovereign Defendants and the amount of punitive damages; (2) whether a multiple of compensatory damages is appropriate given the potential for imbalanced punitive awards among families where decedents' earnings were disparate; and (3) how to rationalize punitive damages in this case in light of past and future cases stemming from the 9/11 attacks. If plaintiffs advocate for the Flatow method, they should submit evidence sufficient for the Court to make a reasoned calculation of the Sovereign Defendants' level of financing for terrorism.

### IV.    Prejudgment Interest

Plaintiffs are not entitled to prejudgment interest at New York's nine percent statutory interest rate because solatium claims are not permitted under New York's wrongful death statute. See Gonzalez v. New York City Hous. Auth., 77 N.Y.2d 663, 667–68 (1991) ("New York . . . has steadfastly restricted recovery to 'pecuniary injuries,' or injuries measurable by money, and denied recovery for grief, loss of society, affection, conjugal fellowship and consortium.") (citation omitted).

Accordingly, the prejudgment interest rate to be applied to all of the Plaintiffs' claims is a matter of the Court's discretion. See Gierlinger v. Gleason, 160 F.3d 858, 873 (2d Cir. 1998) (finding that trial court's discretion to award prejudgment interest is guided by "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness

and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.").

The Court recommends that all Plaintiffs be awarded the 4.96 percent average prime rate published by the Federal Reserve Board during the period from September 11, 2001, through January 1, 2013. This is consistent with the Hoglan Report, issued on October 12, 2016, and Judge Maas's recommendation in Havlish, Havlish Report, 2012 WL 3090979 at *6.

## CONCLUSION

For the foregoing reasons, I recommend that solatium damages be GRANTED to plaintiffs Lea Bitterman, Sean Bitterman, the Estate of Marion Thomas, Keith Bradkowski, Kathryn Collman, Charles Gengler, Susan Bohan, Steven Gengler, Arlene Peabody-Bane, Brian Major, Brenda E. Jobe, Colleen McDonald, and Aleese M. Hartmann in the amounts set forth above. I recommend that all other non-immediate-family member plaintiffs' claims be DENIED because they have not proven that they were functional equivalents of immediate family members. The portions of the compensatory damages which are awarded for solatium should be subject to interest at the rate of 4.96 per annum, compounded annually, through the date that judgment is entered. I further recommend that plaintiffs' claims for punitive damages be DENIED WITHOUT PREJUDICE to a future application.

In order to expedite the issuance of partial final judgment in this case, plaintiffs are instructed to submit to Judge Daniels an exhibit containing information regarding every plaintiff to whom I recommend damages be awarded. This exhibit should omit any reference to the plaintiffs whose claims I recommend be denied

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:    New York, New York
             October 14, 2016

*                    *                    *

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge George B. Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).